**Robert McGINNIES, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 57275.

Court of Criminal Appeals of Texas, Panel No. 3.

Jan. 24, 1979.

Stan Brown, Abilene, for appellant.

Lynn Ingalsbe, Dist. Atty., Patricia A. Elliott, Crim. Dist. Atty., and Aleta Hacker, Asst. Dist. Attys., Abilene, for the State.

Before DALLY, W. C. DAVIS and CLINTON, JJ.

OPINION

CLINTON, Judge.

Appellant was found guilty of burglary in that he intentionally or knowingly entered a building not open to the public without the effective consent of the owner thereof, and did commit the felony offense of criminal mischief by damaging an automobile in an amount of pecuniary loss of over $200.00 but under $10,000.00. Upon a finding that he had been previously convicted of a felony the jury assessed his punishment at 18 years' confinement and thereafter the trial court duly sentenced appellant to serve a term of not less than 5 nor more than 18 years in the Texas Department of Corrections. This appeal timely followed on two grounds of error: first, sufficiency of evidence to sustain a conviction in this circum-

stantial evidence case is challenged and, second, the indictment is asserted to be duplicitous because alleging two culpable mental states.

The building entered is Rocket Oldsmobile at 1800 South First in Abilene, Taylor County, Texas. Sunday morning, July 11, 1976—the alleged date of the offense—just before 9:00 a. m., Carlton Allison, a company salesman, unlocked the west doors of and entered onto the showroom floor, turned right and went directly to the service department to obtain keys to an automobile he was going to deliver to a customer that morning; while in the process of obtaining the keys he heard someone toward the back of the service department and a kind of noise that sounded like a bucket or something had been moved or set down. Proceeding in the direction of the noise he observed a person, called out "what is going on here?" and saw the person leaving the area through a back door that led into a storage area and, as he moved closer, saw the person crawling out a window and exiting the building. Admitting his view of the intruder was fleeting at best Allison was able to say only that he observed a black person, believed to be a male, wearing light, perhaps beige colored pants and a blue shirt with a small light tan or beige hat or cap. Shortly thereafter, Donald T. Paige, Jr., the owner and general manager of Rocket Oldsmobile, appeared and he and Allison found that several automobiles in the service department had been splashed, inside and out, with a carburetor cleaning fluid, apparently containing a solvent called naphtha,[1] and battery acid, causing extensive damage to both new and used cars including a 1972 Oldsmobile Toronado, owned by appellant, who had earlier brought it in for repair, that was more severely damaged.

That the building was unlawfully entered and several of the automobiles therein were severely damaged by vandalistic application of various liquids identified by one or another witness are not disputed. The critical issue in this circumstantial evidence case is whether proof is sufficient to support the verdict of the jury that appellant was the perpetrator. Even on this issue, however, the contest is not so much over disputed facts but the permissible inferences to be drawn from the factual testimony presented by the State and appellant.

In August 1975 a loan officer with an Abilene bank approved a loan to appellant to buy a 1972 Oldsmobile Toronado from a local automobile dealer; the purchase note was co-signed by Bill Smith, appellant's employer, who saw that· the payments were made by deducting the amount from appellant's wages. On July 11, 1976, balance due on the note was $2,387.20 and the Toronado was insured against such comprehensive risks as damage from vandalism. Before July 11, 1976—on a date not shown—appellant brought his Toronado to Rocket Oldsmobile for repair of front wheel drive axle and for an estimate of front section body damage—the former at a cost of $260.00 and the latter coming to some $400.00. About a week before July 11, 1976, appellant was notified that repair work had been completed but he had not paid the amount due nor, of course, obtained possession of his automobile.

Appellant resided at 943 North San Jose on "the north side of town." According to his witness, Melvin Walker, who owns and operates a business of cleaning old and new cars at 5201 North First, appellant came by

---

1. After testifying that "either battery acid or carburetor cleaning fluid, which is a type of acid, or a solvent," had been thrown on three new cars, Paige responded to a question as to whether "this carburetor cleaner, battery acid, or whatever" was already in the service department or had to have been brought in by the vandal that "you will find a container of it at every mechanic's work stall. They use it to clean carburetors with, and then they use the naphtha to clean other parts with and also their hands with." Later in pointing out damage reflected by a photograph in evidence, Paige observed that "this particular vehicle here had more of the carburetor acid outside, and naphtha as evidenced by the white color on the inside."

Melvin Walker, called by appellant, testified that he was in the business of cleaning up used and new cars and in cleaning their engines used naphtha and soap.

in his Ford pick-up on the Sunday morning in question at about 8:00 a. m., they talked about fifteen or twenty minutes and appellant left with about a gallon of naphtha he bought from Walker,[2] he said, to wash the engine of his pick-up; however there is no evidence that he actually did so.

Upon his arrival at Rocket Oldsmobile shortly after 9:00 a. m., hearing a report from Allison, surveying the damage[3] and calling the police, Paige and investigating officers noticed by the west door of the service department a fairly old model Ford pick-up that had not been there the evening before and one that he did not recognize—subsequent registration check revealed that the Ford pick-up was registered to appellant and that he still owned and was driving that Ford pick-up Sunday morning seems uncontroverted. Raising the hood of the Ford pick-up, Paige and others detected that its engine and radiator were still warm to touch, indicating it had been driven within "the last couple of hours." The pick-up was facing south, its rear end being toward South First, a street that runs east and west, and although it was closer to the rear of the building the pick-up was visible from South First.

As he was driving from his home at 218 North Bowie going east on South First on his way to Sunday School "somewhere around 9:30 a. m.," Dean Allen, a friend of appellant, saw him walking west on South First; according to Allen appellant was wearing dark colored pants, a sort of red jacket—either red or orange colored that was a loud color—and was not wearing a hat. Allen recalled that the weather was mild and it was not raining.[4] Being late to his destination, Allen did not stop for appellant.

Another friend of appellant lived at 302 Portland with his wife, Marie Stillwell—eight tenths of a mile from Rocket Oldsmobile on a street that intersects with South First. Charles Allen Kidd, obviously a reluctant witness for the State, testified that between 9:00 and 9:30 a. m. on the same Sunday morning appellant came to his house and requested Kidd to drive him to his home on San Jose, telling Kidd that his pick-up "had drowned out" and "is stalled" and asking for help in looking for some "booster cables." While appellant was in the Kidd residence, Stillwell, who was suffering from asthma and hayfever, noticed an unusual odor that made her think something was burning in the house; the odor remained after Kidd and appellant left to the extent that she went through the house looking for something that was burning. Departing his residence, under the directions of appellant, Kidd drove back to South First street, turned east toward Rocket Oldsmobile and after they went by it appellant told Kidd they had passed his pick-up; appellant then asked Kidd to drive on to the residence of Willie Charles Johnson so that Johnson could go back and collect the pick-up, appellant explaining that he did not want to get it himself because there were police cars by it and he had

2. Obviously experienced in his business, Walker testified that one working with naphtha would have an odor about his person because "you can smell it a mile away" and the odor would be noticeable to others in a room or automobile because "you will carry the odor wherever you go."

3. As Paige saw it, appellant's Toronado was more severely damaged: the acid was "everywhere: in the front seat area, in the floor board area, even in the tape deck and front and rear seat, and all over the front and rear of the car, externally." Difficulty that morning in ascertaining that the Toronado belonged to appellant was caused by the fact that original copies of the work order for repairing it could not be located and of all the work orders for other automobiles in the shop, it was the only one missing—indeed, at time of trial it still had not been located and Paige thought that "unusual."

4. Nearly every other witness asked about it reported that there was or had been rain or mist that Sunday morning. We deem it appropriate to observe—as the jury may well have—that Dean was impeached on cross-examination by his admission of conviction for check swindling and revocation of probation, confinement in Texas Department of Corrections for a year or two, confinement in county jail about four months for check swindling—as best we can determine from the testimony, some four convictions.

outstanding traffic tickets.[5] With Johnson in his car, Kidd and appellant went back to the area of Rocket Oldsmobile and let Johnson out near a Texaco station on South First and observed him walk over to the premises of Rocket Oldsmobile where police cars were parked behind appellant's pick-up. Then Kidd drove appellant to his home on North San Jose. During these movements Kidd sensed a peculiar odor about appellant, a smell that "sort of stung your nose . . . made your nose burn," that he had not noticed until appellant got in his automobile,[6] and also observed that appellant seemed to have something splashed on his clothing that, because he had been walking in rain, Kidd "presumed" was made by the rain. The next day, being investigated himself, Kidd told Officer Skiles the odor about the person of appellant and was taken to Rocket Oldsmobile to smell the odor in the service department. He testified on direct examination by the State that the service department odor burned his nose but that he "couldn't say" it was the same kind of smell on appellant; on cross-examination by appellant, Kidd stated that he "can't say for certain" that the two odors were the same.[7] Also on cross-examination Kidd believed appellant was wearing blue pants, blue and off-red checked shirt, but was positive his pants were not beige or tan.

Meanwhile, back at Rocket Oldsmobile, Allison and Paige were cleaning cars and areas of the service department, opening all doors and windows to dissipate the odor in it,[8] and officers were conducting their investigation of the premises and the Ford pick-up found near west doors of the service department—efforts at lifting latent fingerprints were unsuccessful and the damaging liquids were not tested. Willie Charles Johnson arrived, started appellant's pick-up and was leaving the area when stopped by officers. Officer Hutcheson testified that when he first examined the interior of the pick-up he did not notice any keys in it and cross-examination conceded the possibility that keys might have been in the ignition, but he was certain that Johnson had keys for the ignition when stopped. Kidd and Hutcheson testified that Johnson did not have the peculiar, distinctive odor about him and no one noticed a container or smell of naphtha in or about the pick-up sufficiently to remark about it in testimony.

Learning that the Ford pick-up was registered to appellant and his address, Officer Hutcheson contacted Officer Danny Spohn and requested him to observe the residence of appellant at 943 North San Jose. On surveillance Officer Spohn saw Kidd [9] pull into the drive at that address and watched a person get out of the car and walk into the house—the black male was wearing a

5. A warrant officer for Department of Public Safety Highway Patrol confirmed three or four warrants and recalled a telephone conversation with appellant shortly prior to July 11, 1976, seeking to make arrangements to go before a magistrate and get the matter cleared up.

6. Monday morning Officer Hutcheson, having been told by Kidd of the odor in his car, investigated and determined that its smell was the same he had sensed at Rocket Oldsmobile the day before.

7. The trial court rules that the State had shown surprise and permitted the prosecutor to impeach Kidd with a prior sworn statement made to a police officer, reading, "I am positive that the odor inside Rocket Oldsmobile will be the same odor that was on Robert McGinnies when he came into my home on Sunday morning . . ."—a statement that Kidd attempted to recant, insisting at trial that he "can't be sure that was the odor." Kidd did acknowledge that such an odor was not on Willie

Charles Johnson or that he did not know if it were.

8. Allison described the odor as smelling like acid and it seems to create a fume in the air, a burning type of odor like a hot battery that is distinctive. Paige said it was a very distinctive eye-watering smell, "kind of a sulphuric type acid smell;" the windows and doors were kept open all day and half the night and the smell was there two weeks later. Lloyd Skiles, criminal investigator, observed damage done to the motor vehicles by naphtha, carburetor cleaning solution and battery acid and described the smell as distinct and strong which caused a burning sensation to the eyes.

9. There is no question about the driver being Kidd since Officer Spohn stopped the car, determined identity of its driver as Kidd and issued him a ticket for driving without a license.

dark blue short sleeved shirt, light brown or khaki colored pants and a small light colored or white hat. The features of the person and clothing he observed were the same as descriptions given him by Officer Hutcheson.[10]

Monday, July 12, 1976, a warrant was issued for arrest of appellant and about noon—whether in response to the warrant is not shown—appellant presented himself to Officer Skiles at the Abilene Police Department.

The court charged the jury on circumstantial evidence in the usual form and correctness of the charge is not challenged. We believe the evidence was sufficient to support the verdict of the jury and, on the other hand, that the evidence failed to raise a reasonable hypothesis other than the guilt of appellant as required by, e. g., *Nilsson v. State*, 477 S.W.2d 592, 597 (Tex.Cr.App. 1972).

A burglary to commit criminal mischief such as alleged and proven in this case does not ordinarily result in its perpetrator possessing "fruits of the crime" as in say burglary with commission of theft. But in the situation presented here it might be reasonably expected that the perpetrator would not only come away with an odor of naphtha, carburetor cleaner and battery acid but also with stains of the liquid on his clothing from sloshing, splashing, and spattering the fluids on or about automobiles, cabinets and other surfaces in the service shop. As Kidd was driving appellant about in his car he not only noticed the odor emanating from appellant, but also observed notable splashes of something on his clothing that, because it was raining, Kidd "presumed" was rain.

Indeed, every witness who encountered appellant that Sunday morning detected a peculiar odor about his person and appellant in effect concedes the small by presenting

testimony of having acquired it in another manner—from Walker for the asserted purpose of cleaning the engine in his pick-up. However, as already pointed out, no one who inspected the pick-up reported a container of naphtha or a similar odor coming from its engine, nor is there any evidence that during the time appellant is said to have obtained naphtha from Walker and discovery of the pick-up appellant applied naptha to its engine. Officers who stopped Johnson from driving the pick-up away did not detect a smell of naphtha or carburetor cleaning fluid about him. Thus, the jury would have been justified in rejecting the suggestion that the admitted odor about the person of appellant came from handling naphtha which Walker said had been obtained from him.

Appellant himself adduced evidence that at about 8:00 a. m. on the Sunday morning in question, he was in his pick-up at a business location at 5201 North First. Shortly after 9:00 a. m. he is placed by his friend Allen on South First in the vicinity of Rocket Oldsmobile apparently on his way to the Kidd residence on a street that intersects with South First.

Several witnesses testified that in examining appellant's pick-up shortly after the burglary was discovered they felt the hood and radiator were warm to touch, thereby indicating that it had recently been driven. In attempting to collect the pick-up for appellant and at his request, Johnson had keys to start it. Thus, there was sufficient evidence for the jury to conclude not only that appellant's pick-up had been just recently driven on to the premises of Rocket Oldsmobile but also that appellant, knowing its location and arranging for Johnson to recover it, had himself driven the pick-up to its location.

Moreover, appellant resided at 943 South San Jose and at about 11:00 a. m. a person who got out of the car driven by Kidd was

<hr>

10. The record does not reveal how Officer Hutcheson came by a description of clothing but as one of the first officers on the scene at Rocket Oldsmobile, presumably he obtained it from Allison, the salesman who startled the intruder in the service area; no one else was

then known or had come forward unless it was Johnson, who did not testify and whose conversation with Hutcheson upon being stopped from driving away in the Ford pick-up was not revealed to the jury.

observed by a surveilling officer to enter the residence wearing clothing that matched the description given by Allison, who saw the intruder exit out the old wash room and out the south window of Rocket Oldsmobile; a dark blue shirt, light brown or khaki colored pants and a light colored or white small hat.[11]

To present the jury with a reasonable hypothesis other than the guilt of appellant, his brief points to testimony from a State's witness that it would have been more logical for a burglar to park a pick-up by the south window rather than the west door where it could be viewed from the street; according to Kidd, appellant was wearing blue pants and a red shirt; fingerprints were not lifted from any surface at Rocket Oldsmobile; the liquids found to have damaged the vehicles were not tested in any manner; the skin of appellant was not shown to have sustained any damage or injury such as might be caused by the damaging liquids; another witness observed appellant on that Sunday morning walking west on South First Street wearing dark pants and a red jacket; at approximately 8:00 a. m. on the morning in question, appellant had bought naphtha for the asserted purpose of cleaning his pick-up engine; repairs for damages from vandalism on the 1972 Oldsmobile Toronado had been completed at a cost of $75.00 [12] and the value of the car was estimated to be between $1,750.00 and $2,200.00.[13]

Having reviewed all evidence, including the testimony to which we have alluded, in this circumstantial evidence case in light of the presumption that the accused is innocent, 24 Tex.Jur.2nd, Evidence, Sec. 742, p. 422, quoted approvingly and applied in Ysasaga v. State, 444 S.W.2d 305, 309 (Tex.Cr. App.1969), we believe that a conclusion of guilt was warranted by the combined and cumulative force of all the incriminating circumstances, and there was ample evidence from which the jurors, properly charged as they were, might reasonably conclude that every reasonable hypothesis other than guilt was excluded. More than mere presence in the vicinity of the burglary and what might be considered flight, cf. Cascio v. State, 145 Tex.Cr.R. 61, 165 S.W.2d 1001 (1942); Moore v. State, 532 S.W.2d 333, 337 (Tex.Cr.App.1976); Robinson v. State, 570 S.W.2d 906 (Tex.Cr.App., P.3, 2nd Q., 1978), incriminated appellant: presence of his abandoned pick-up on the premises of the burglarized building; the peculiar odor of liquids used and found within the burglarized building that permeated his being and attracted every person with whom he came in contact and the stains observed on his clothing; matching descriptions of clothing worn by the intruder as he left the burglarized building and the person who shortly thereafter left the Kidd automobile and entered appellant's residence; the inherently contradictory explanations appellant gave Kidd as to the condition of his pick-up; the presence of appellant's 1972 Oldsmobile Toronado with an unpaid repair bill of $260.00 which was fully insured against, inter alia, damage caused by vandalism and was the most severely damaged of all other automobiles in the service area and its missing work order.

Characterizing it as "very similar in its facts," appellant relies on Greer v. State, 437 S.W.2d 558 (Tex.Cr.App.1969) for reversal in his case. But the problems that confronted the Court in Greer are resolved by more than sufficient evidence here. Thus, in Greer the Court was unable to find sufficient evidence to show that the burglary there committed was for the purpose alleged whereas here there can be no doubt that entry was made to commit the felony offense of criminal mischief by damaging

11. We are mindful that Kidd testified that appellant was wearing blue pants and a blue and off-red shirt and was certain that the color of the pants was not beige or tan and that Dean reported dark colored pants and either a red or orange jacket. As already noted, however, credibility of both in this regard is stoutly challenged by effective impeachment of each.

12. According to the State's witness, the cost of repairs was about same as value of the damaged Tornado.

13. According to the State's witness, the value was between $1,300.00 and $1,500.00.

the motor vehicles therein, as was abundantly shown; absence of a witness to the burglary in *Greer* is supplied here by the presence and observations of Carlton Allison, the salesman who was the first to arrive at Rocket Oldsmobile and surprise the intruder in the process of his mischief. Unlike *Greer* who was not shown to be in, near or around the garage after he left the night before, here appellant at least through the presence of his pick-up on the premises contemporaneously with the burglary and being "abroad" of that morning coupled with the matching descriptions constitute more than a suspicion that he was indeed, about the garage Sunday morning and immediately thereafter in the neighborhood at Kidd's house with whom he returned to the location of Rocket Oldsmobile. Finally, again unlike the situation in *Greer,* the evidence satisfactorily demonstrated that the 1972 Toronado Oldsmobile in the service shop was the same 1972 Toronado Oldsmobile insured by appellant—indeed, after the State proved through one of its witnesses the purchase of the automobile and paying of premiums for insurance covering it, appellant produced the co-signer of the purchase note who possessed a copy of the insurance policy and went with appellant to Rocket Oldsmobile to collect the damaged vehicle and assist in repairing it. Clearly, therefore, the State proved here what it failed to show in *Greer* and, accordingly, reliance upon *Greer* is misplaced.

Finding the evidence sufficient to support the verdict of the jury in this circumstantial evidence case, the first ground of error is overruled.

■ In his second ground, appellant contends that the court erred in refusing to quash indictment "because it alleged two culpable mental states," but actually the record reflects a motion to quash indictment June 26, 1977 and another motion to quash indictment on different grounds filed June 24, 1977, while there is in the record only a single order dated June 29, 1977, denying defendant's motion to quash indictment, without specifying which motion is being ruled. Otherwise, there is no indica-

tion in the record that the earlier filed motion to quash was ever presented to, considered and decided by the court. Moreover, the motion to which the ground of error refers does not complain that the indictment alleges two culpable mental states; rather, the challenge is that the indictment is duplicitous in that it alleged appellant entered the described building and "attempted to commit and committed the felony offense of criminal mischief." The situation thus presented by a motion alleging that the indictment is duplicitous and a ground of error asserting that it alleges two culpable mental states is complex enough but then it is further compounded by the response made by the State that focuses upon the "intentionally and knowingly" allegations in the indictment. Rather than unravel the confusion, we simply observe that in its charge the court, in applying the law to the facts, required the jury to find whether appellant "intentionally *or* knowingly" entered the building and therein "commit the felony offense of criminal mischief," omitting any reference to an attempt to commit. In these circumstances we fail to find any error in the indictment that would warrant reversal.

The judgment of the trial court is affirmed.